IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

PATRICK IAN HOOD
Plaintiff,

v.                                                          Case No. 08-3112-JTM

T. HALL,
Defendant.

MEMORANDUM AND ORDER

This matter is before the court on the defendant's motion for summary judgment. (Dkt. No. 29). Pro-se Plaintiff, Patrick Ian Hood, alleges that the defendant, T. Hall, violated his constitutional rights and asserts a Section 1983 excessive use of force claim as his theory of recovery.

Hood was an inmate in Butler County Jail ("BCJ") beginning January 9, 2008. Hall was employed as a sergeant at BCJ during the relevant time period. On February 8, 2008, and on February 16, 2008, Hood was placed on 15 days of disciplinary segregation for conduct that attempts to affect the security or operations of the facility.

On February 27, 2008, Sergeant Langley informed Hall that a seven inch piece of tan caulking had been located on the floor in Segregation Dayroom One, between cell BC111, which is Hood's cell and BC112. Deputy Pinkston and Hall went into Segregation Dayroom One to inspect cells BC109, BC111, BC112 and BC114 to determine where the caulking came from and whether any cells had been tampered with or destroyed. Hall and Pinkston entered BC109 and determined the caulking did not come from that cell. Hall looked through the window of cell BC111 and saw contraband in Hood's cell.

At BCJ, inmates are removed from their cells before a cell is searched for officer safety. Pinkston ordered Hood to come to door of his cell so he could be restrained. Pinkston used the "food pass" to place Hood into hand restraints that were double locked. The "food pass" is the opening on a cell door that is used to pass food to an inmate, but is also used by officers to have access to restrain or unrestrain an inmate without having to open the cell door. Inmates are routinely placed in the showers during a cell search, since it is a safe and secure temporary location. Hood's cell door was opened at approximately 9:55 a.m., and Pinkston and Hall escorted him to the handicap shower stall. Hood was placed in the handicap shower stall and the door was closed and secured. On prior occasions when Hood has been placed in the shower for cell searches he has kicked or struck the walls and doors. Hall left the hand restraints on Hood while he was in the shower area. Hall asked Hood if the restraints were all right and comfortable. Hood said the restraints were "okay."

Hall and Pinkston went back to Hood's cell to conduct a search. During the search, Hall heard Hood striking and kicking the shower door. At approximately 10:16 a.m., Hall left Hood's cell to start a watch tour, while Pinkston finished searching the cell. At this point, Hood asked Hall if he could see a nurse because the restraints were too tight and causing numbness in his hands. Hall approached the shower door and told Hood to place his hands through the food pass. The shower doors contain the same opening as the cell doors to allow the officers to restrain/unrestrain the prisoners or pass them toiletries for the shower.

Hall saw that the restraint on Hood's left hand was "finger tight," which means that Hall's index finger could fit between the restraint and the outside of Hood's wrist. The restraint on Hood's right hand was "pinkie tight," which means that Hall's pinkie finger could fit between the restraint and the outside of Hood's wrist. Hall loosened the right restraint one notch to make it "finger tight."

2

The cell search was completed at approximately 10:37 a.m., then Pinkston and Hall removed Hood from the handicap shower to return him to his cell. Hood became verbally abusive towards Hall while being escorted back to his cell. Hood complained that his hands were numb due to the restraints. Hall asked Hood if he wanted to see a nurse and he said he did. Pinkston and Hall escorted Hood to the Infirmary. On the way to the Infirmary, Hood continued to be confrontational with Hall and repeatedly asked if he wanted to go to an area off-camera and "settle this." Pinkston and Hall entered the Infirmary with Hood at approximately 10:38, and he was examined by Nurse Harper.

Hood told Harper that his hands were numb due to the restraints. Harper examined Hood's wrists and applied pressure to different fingers to determine whether he was experiencing any numbness. Hood said he was able to feel Harper touching his fingers and stated that his fingers only felt like they were "asleep". Hood then told Harper that the numbness was resolving and he just wanted to go back to his cell. Harper noted in her assessment: "[c]irculation intact with brisk capillary refill. Sensation intact." Harper reported at the completion of her examination that Hood was okay and could be returned to his cell. She did not note any bruises, scrapes or any other evidence of injury to Hood's wrists.

Pinkston and Hall then escorted Hood from the Infirmary back to his cell. Hood again became verbally abusive to Hall stating they should handle the matter "one-on-one." At approximately 10:43 a.m., Pinkston and Hall placed Hood in his cell. Hood was told to place his hands through the food pass so that he could be unrestrained. He was also told to leave both hands in the food pass until the restraints were removed and then he would be told to put them back in his cell. Inmates are given this instruction for officer safety.

Hall removed the left restraint from Hood's wrists, and he pulled his left hand inside the cell. Hall ordered Hood to put his left hand back outside the cell, but he did not comply. Hall attempted to secure Hood's right hand to the south side of the food pass so that Hood could not cause injury to any officer. Hood attempted to pull his right hand in the cell. Hall pulled Hood's right hand toward him and secured it to the south side of the food pass. Hall ordered Hood four times to place his left hand outside of the food pass. During this incident, Hood called Hall a "coward" and a "pussy" and challenged him to break his wrist. Hood eventually complied and placed his left hand back through the food pass.

Hall removed the right restraint from Hood's hand and ordered him to place his hands back in the cell. Hall then secured the food pass and asked Hood how his hands were. Hood said they were "tingling." Hall or Pinkston did not see any bruises or injuries to Hood's wrist. Hood never made any complaints that day about his wrists. On February 28, 2008, at approximately 10:00 p.m., Hood submitted a medical request for complaints regarding his wrists. Hood was taken to the Infirmary on February 29, 2008, but became verbally abusive towards the medical staff and was not examined.

On April 24, 2008, Hood was involved in a physical altercation with another inmate. The other inmate suffered a fracture to his small right finger, bruising to the right ear lobe and cheek, discoloration and abrasion to the right check and jaw, a half dollar size abrasion to the left cheek, with bruising and red marks on chest area. Hood submitted a medical request form on April 27, 2008, claiming both his "hands, upper arms and wrist have very little feeling in them."

Summary Judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any

material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir.1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir.1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. V. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir.1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c) the party opposing summary judgment must do more than show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

The Eight Amendment protects inmates from the use of excessive force while in confinement. *Whitley v. Albers*, 475 U.S. 312, 327 (1986) (the Eight Amendment prohibits the

unnecessary and wanton infliction of pain on prisoners).  A plaintiff must allege the defendant "acted maliciously and sadistically for the very purpose of causing harm rather than in a good-faith effort to maintain or restore discipline," to establish a constitutional violation.  *Mitchell v. Maynard*, 80 F.3d 1433, 1440 (10th Cir. 1996); *Hudson v. McMillian*, 502 U.S. 1, 7 (1992).  Malicious and sadistic intent can be inferred where there can be no legitimate purpose for the officer's conduct.  *Serna v. Colorado Dept. of Corrections*, 455 F.3d 1146, 1152 (10th Cir. 2006).

     The Tenth Circuit utilizes a two-prong test: 1) the alleged wrongdoing must be objectively harmful enough to establish a constitutional violation and 2) the official acted with a sufficiently culpable state of mind.  *Smith v. Cochran*, 339 F.3d 1205, 1212 (10th Cir. 2003).  "The objective component . . . is contextual and responsive to contemporary standards of decency.  The subjective element . . . turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing."  *Id.* at 1212.  Deference is also given to the prison in reviewing excessive force claims, and the case should not go to the jury, unless the evidence when "viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain."  *Whitley v. Albers,* 475 U.S. 312, 322 (1986)).

     Prison officials have some latitude in dealing with prisoners, and a balancing test is used to consider if a use of force was excessive and was therefore a violation of constitutional rights. One factor to consider is the extent of the inmate's injuries.  *Hudson v. McMillian,* 503 U.S. 1, 7 (1992). Other factors may include "the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.'"  *Whitley* at 321.  Also, the court may

6

consider the reasonableness of the officer's belief, although mistaken, that more force than normal was needed to control a prisoner prone to fight back. *Saucier v. Katz,* 533 U.S. 194, 205 (2001).

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly establish statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 817-818 (1982). In a recent Tenth Circuit case, *Mecham v. Frazier*, 500 F.3d 1200 (10th Cir. 2007), in holding that the police officer was qualifiedly immune, the Court emphasized the problem of split second decisions for police officers in the field. "The reasonableness of an officer's conduct must be assessed 'from the perspective of a reasonable officer on the scene,' recognizing the fact that the officer may be 'forced to make split-second judgments' under stressful and dangerous conditions." *Id.* at 1204 (quoting *Gross v. Pirtle,* 245 F.3d 1151, 1158 (10th Cir. 2001) (quoting *Graham v. Connor*, 490 U.S. 395, 396-97 (1989).

The U.S. Supreme Court recently discussed the two-step analysis required for a qualified immunity determination*. Scott v. Harris*, 550 U.S. 372 (2007). The "threshold question . . . do the facts alleged show the officer's conduct violated a constitutional right?" *Id.* at 377. "If and only if, the court finds a violation of a constitutional right, the next sequential step is to ask whether the right was clearly established." *Id.* at 377. The *Scott* Court reiterated the "objective reasonableness standard." *Id.* at 1776. In *Mecham*, the district court had found there was no fact dispute, but still denied summary judgment. *Mecham v. Frazier*, 500 F.3d 1200, 1204 (10th Cir. 2007). The Tenth Circuit emphasized that the question of objective reasonableness is not for the jury to decide where the material facts are uncontroverted. *Id.* at 1203-04.

A plaintiff must prove he sustained an actual injury to assert a claim of excessive force for unduly tight handcuffs. *Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1208 (10th Cir. 2008). "[U]nduly tight handcuffing can constitute excessive force where a plaintiff alleges some actual injury from the handcuffing and alleges that an officer ignored a plaintiff's timely complaints (or was otherwise made aware) that the handcuffs were too tight." *Cortez v. McCauley*, 478 F.3d 1108, 1129 (10th Cir. 2007). Hood does not allege that Hall ignored complaints regarding the handcuffs being too tight. Therefore, Hood does not establish a claim of excessive force for unduly tight handcuffs.

Hood asserts an excessive force claim against Hall, claiming "Sgt. T. Hall willfully acted in conduct that was harassing in nature and maliciously used excessive force that caused bone fractures and permanent nerve damage to my left and right arms." (Dkt. No. 14 at 5). In support of his allegation, Hood states "[o]n February 27, 2008, Sgt. Hall twisted and yanked on the plaintiff's arm's [sic] through the shower access hole and then again on the plaintiff's cell door causing bruising and cuts that left permanent physical and emotional damage." (Dkt No. 14 at 5). Hall claims he is entitled to qualified immunity. (Dkt. No. 30).

In assessing Hood's complaint against Hall, the court finds that the use of force implemented was not implemented for the purpose of causing harm in a malicious or sadistic fashion. The officer's use of force was reasonable. Despite Hood's assertions that there are genuine issues of material fact, this court does not agree that a reasonable jury, in resolving the matter, could rule in his favor.

Hood contends he sustained "multiple bone fractures and permanent nerve damage to his hands and arms" (Dkt. No. 14 at 2). Hood's description of the facts does not present a genuine issue of disputed fact for several reasons. According to the affidavits of the officers present when the use

of force occurred, Hall was responding to Hood's disregard of orders requesting that he keep his arms in the food pass until both arms were released from the restraints. Hood was non-compliant after repeatedly being asked to keep both arms in the food pass.

Medical evidence further discredits Hood's story. Immediately following the alleged shower and cell incident, Nurse Harper saw no bruises, scrapes or other evidence of physical injury to Hood's wrists. Hood made only one request for medical treatment, and that was on the day after the incident, but he became verbally abusive with staff and no exam was performed. Hood made no other complaints or requests for medical treatment until April, 27, 2008, which is three months after the alleged shower and cell incident. This request for medical treatment came after Hood was involved in a physical altercation with another inmate. The court also notes that Hood stated on the medical request form that his injury occurred on April 25, 2008. (Dkt. No. 30-2 at 14). It would not be reasonable for the court to conclude that Hood suffered multiple bone fractures and nerve damage from Hall's actions, but did not seek medical treatment for three months. Hood does not offer any supporting evidence or medical evidence of any type of injury.

Even when viewed in a light most favorable to Hood, the plaintiff failed to sustain the burden necessary to overcome summary judgment on the excessive force claim. There is no evidence that Hood suffered injuries, but any injuries that might have occurred are more indicative of a struggle to restrain a defiant inmate, than a reflection of an attack involving "wantonness in the infliction of pain." Balancing the extent and/or the lack of Hood's injuries with the deference given to the prison in its need for Hall to maintain control over a disruptive prisoner, reveals that the use of force was not excessive.

Excessive force claims are evaluated for objective reasonableness based upon the information the officers had when the conduct occurred.  *Saucier v. Katz*, 533 U.S. 194, 207 (2001).  In a situation such as the present case, it would be objectively reasonable for a police officer to "twist or yank" on Hood's arms in an attempt to restrain him.  The court finds that Hood has failed to meet the "heavy burden" of showing that Hall violated his constitutional right to be free from cruel and unusual punishment when he carried out the use of force.  Summary judgment is appropriate on this claim.  The plaintiff has not raised a genuine issue of material fact regarding the objective reasonableness of Hall's alleged use of excessive force.  The plaintiff has failed to establish a constitutional violation.  The Court finds that Hall is entitled to qualified immunity.

IT IS ACCORDINGLY ORDERED this 26th of June, 2009, that defendant's motion for summary judgment (Dkt. No. 29) is granted; plaintiff's motion to appoint counsel (Dkt. No. 20) is denied as moot.

s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE